**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARK J. HUEBNER**,

                                    **Plaintiff,**

-against-                                             **3:06-CV-1025**

**OLUM'S OF BINGHAMTON, INC.,**

                                    **Defendant.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

## I.    INTRODUCTION

Plaintiff Mark J. Huebner ("Huebner") commenced this action pursuant to the Fair

Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA"), and the New York Fair Credit

Reporting Act, N.Y. Gen. Bus. L. §§ 380-380s, seeking actual damages as well as punitive

damages, attorneys fees, and costs.  Compl. 6 [dkt. # 1].  Defendant Olum's of

Binghamton, Inc. ("Olum's") counterclaimed pursuant to 15 U.S.C. § 1681n(c), asserting

that Huebner's action was filed in bad faith or for the purpose of harassment, and seeks

costs, expenses, attorney's fees, and disbursements incurred in defending this action.  V.

Answer ¶¶ 15-17 [dkt. # 6].  Olum's has moved for summary judgment pursuant to Fed. R.

Civ. P. 56 seeking to dismiss the action.  Plaintiff has opposed the motion.

## II.    STANDARD OF REVIEW

### a.    Summary Judgment Standard

The Court may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual issues that can only be resolved at trial.  Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).  The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, or by a factual argument based on "conjecture or surmise."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, Rexnord Holdings, Inc. v. Bidermann, 21

2

F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation.  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, --- U.S. ----, 127 S. Ct. 1769, 1776, 167 L. Ed.2d 686 (2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id. at 1776.

### b.    Local Rules Requirements

_____The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which

> shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits.

N.D.N.Y.L.R. 7.1(a)(3).  Once a properly supported Local Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

> file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Id. (underscoring in original).

A properly supported fact presented in a moving Statement of Material Facts will be deemed admitted when the responsive Statement of Material Facts offers only a conclusory denial of that fact, or fails to include any record citation for the denial. N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir. 2005); see Meaney v. CHS Acquisition Corp., 103 F. Supp.2d 104, 108 (N.D.N.Y. 2000)(deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations – specific or otherwise – to the record")(emphasis in original); McKnight v. Dormitory Auth. of State of N.Y., 189 F.R.D. 225, 227 (N.D.N.Y. 1999)(McAvoy, J.)("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); Osier v. Broome County, 47 F. Supp.2d 311, 317 (N.D.N.Y. 1999) (McAvoy, J.)(deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

## III.    BACKGROUND

The following facts are taken in the light most favorable to Huebner, the non-movant.  Except as indicated otherwise, these facts are taken from the undisputed facts in Olum's Statement of Material Facts [dkt. # 16-17].

In January of 1999, Huebner entered into an agreement with Olum's to buy two cook tops at a total price of $198.00. Pl. Counter S. of Material Facts ¶ 4 [dkt. # 25].  He paid a down payment of $40.00.  Pl. Counter S. of Material Facts ¶ 4 [dkt. # 25].  Huebner did not pick up the two cook tops, and, instead, decided on January 16, 1999 to purchase

four cook tops from Olum's for a total price of $384.44.  Id.  Huebner and Olum's agreed to apply the $40.00 down payment from the two cook tops toward the purchase price of the four cook tops.  Id.  Huebner also paid an additional $50.00 down payment toward the purchase of the four cooks tops.  Id.  Consistent with this agreement, Huebner entered into a Retail Installment Contract with Olum's on January 16, 1999 for the purchase of the four cook tops.  See Def. Ex. F [dkt. # 16-8].  The January 16, 1999 contract, referred to by the parties as the "I-18 Contract,"[1] reflected the total price of $384.44 for the four cook tops, a cash down payment of $50.00, a credit from the prior contract of $40.00, and a total amount owed of $294.44.  Id.  The I-18 Contract called for three consecutive monthly installment payments of $99.00 beginning on February 20, 1999.  Id.  Huebner contends that he never picked up the four cook tops that were the subject of the I-18 Contract.  Pl. Mem. of Law in Opp'n  2 [dkt. # 24].

On May 28, 2000, Huebner entered into a Retail Installment Contract with Olum's for the purchase of seven cook tops for the total price of $173.80.  Def. Ex. G [dkt. # 16-9]. The May 28, 2000 contract, referred to by the parties as a the "I-20 Contract," reflects a total price of $173.80 for the seven cook tops, a down payment of $50.00 cash, and a total amount owed of $123.80.  Id.  Huebner contends that the I-20 Contract was a modification of the I-18 contract in that the parties agreed that Huebner would buy the seven cook tops at the lower price instead of the four cook tops reflected in the I-18 Contract.  Pl. Counter S. of Material Facts ¶ 4 (dkt. #25).   However, the I-20 Contract does not reflect that Huebner received a $90.00 credit from the I-18 contract (*i.e.* $40.00

---

[1]This was the 18th Installment Contract entered into between Olum's and Huebner. See Titus Dep. 11 [dkt # 16-5].

from the two-cook top down payment and $50.00 from the four-cook top down payment)

toward the purchase price of the seven cook tops.  Def. Ex. G [dkt. # 16-9].   There is no

dispute that Huebner received and paid for the seven cook tops which are the subject of

the I-20 Contract.

Generally, billing for Olum's is triggered when the merchandise is picked up, with

the first bill being generated within 30 days of the pick-up date.  See Titus Dep. 9 [dkt. #

16-5]; Pl. Counter S. of Material Facts ¶6 [dkt. # 25].   However, Huebner received the first

bill for the I-18 Contract on October 20, 2000, twenty-two months after entering the

contract.  The bill was for $294.44.  Olum's attributes the delay in billing to a computer

coding or input error.  Huebner contends that, because the merchandise was never picked

up, the billing process was not initiated until an Olum's internal finance date (October 15,

2000) was reached.  Pl. Mem. of Law in Opp'n 2 [dkt. # 24]; see Titus Dep. 13-14 [dkt. #

16-5].

After receiving the bill, Huebner contacted Olum's to dispute it.  Olum's "researched

the facts surrounding the I-18 invoice and confirmed that the amount of $294.44 was still

due and owing and [Huebner] was informed of this fact."  S. of Material Facts ¶ 8 [dkt. #

16-17].  Huebner responded with a letter dated November 14, 2000 stating that he had

never received any items from Olum's that were not paid for and requesting that the

balance be removed from his account.  Huebner contends that in December 2000, he

discussed the matter with Michael Morgan, then-Vice-President of Olum's, and that

Morgan acknowledged the error and agreed to remove the item from Huebner's credit file.

Pl. Mem. of Law in Opp'n 3 [dkt. # 24].[2]   Nonetheless, David Titus, Olum's Chief Financial

Officer, attests that "[m]y investigation at that point indicated that $294.44 was still due and

owing from plaintiff in regard to I-18." Titus Aff. ¶ 12.  Further, "[i]n January of 2001,

plaintiff advised Olum's that he would not send payments on I-18 and he demanded that

his account be closed." Def. S. of Material Facts ¶10 (citing Titus Aff. ¶ 13[3]); see Pl.

Counter S. of Material Facts ¶10 (denying the fact set forth in Olum's S. of Material Facts

¶10 but providing no citation to the record supporting that denial).[4]  It appears that it was

at this time that Olum's closed Huebner's account and charged off the $294.44 that

Olum's believed was still due and owing on the I-18 Contract.  Titus Aff. ¶ 13.

      In August or September of 2005, Olum's began reporting credit information to

Experian.  On or about March 27, 2006, Huebner received a letter from Chase Bank which

closed a line of credit as a result of "one or more delinquent accounts and a balance on

revolving accounts being too high compared to limit." S. of Material Facts ¶¶ 25-26 [dkt. #

16-17].   Huebner then obtained a copy of his credit report which listed the Olum's charge-

off. Pl. Mem. of Law in Opp'n 3 [dkt. # 24].

      On April 10, 2006, Huebner met with Olum's representatives who advised Huebner

---

[2]In support of this contention, Huebner supplies his affidavit and a copy of his November 14, 2000 letter. See Mervis Aff., Ex. L.

[3]Titus asserts that "[i]n January of 2001, the plaintiff indicated that he would not send payments on I-18 and he wanted his accounts with Olum's closed.  He indicated he would never buy at Olum's again.  In response, I had the plaintiff's account closed and charged off the $294.44 still due and owing on Contract I-18." Titus Aff. ¶ 13.

[4] Because Huebner has not adequately refuted the facts set forth in Def. S. of Material Facts ¶10, these facts are deemed admitted for purposes of this motion.

that they would not accept payment for the debt,[5] nor would they remove the information from his credit report.  Id. at 3–4; Def. Ex. B at ¶ 14 [dkt. # 20-2].  Huebner next contacted Experian, as well as other credit reporting agencies, to dispute the item. Pl. Mem. of Law in Opp'n  4 [dkt. # 24].

Experian sent a Consumer Dispute Verification (CDV) to Olum's on April 26, 2006 regarding Huebner's dispute surrounding the I-18 Contract.   The CDV indicated that Huebner was disputing the "present/previous account status/payment history profile/payment rating" and indicated that Huebner claimed that he had paid the disputed debt.  Def. Ex. E [dkt. # 20-5].  In response to the CDV, Titus began researching Huebner's claim that the reported debt was inaccurate.  Titus first verified Huebner's address, Social Security number, date of birth, and other identifying information to ensure that the information furnished to Experian was for the correct customer.  Def. Ex. B ¶ 17 [dkt # 20-2].  Next, Titus checked the I-18 Contract itself to verify the contract information. Id.  Because the CDV indicated that Huebner claimed that he had paid the disputed debt, Titus then reviewed Huebner's payment history as well as correspondence between Olum's and Huebner.  Id.  This information confirmed that Olum's had not been paid on the I-18 Contract.  Id.

Titus also attempted to search for the merchandise pickup logs relevant to the I-18 Contract to see whether there was proof that Huebner had picked up the four cook tops.  However, Olum's retains such records for only five years and because more than five years had passed since the contract date, the merchandise pickup logs relevant to the

---

[5] Olum's Chief Financial Officer, David Titus, attests that Huebner offered to pay the $294.44 and then "take Olum's to Small Claims Court to 'fight it out and see who is right.'" Def. Ex. B ¶ 14 [dkt. # 20-2].

disputed charge could not be reviewed.  Reply Aff. in Supp. ¶¶ 2-4 [dkt. # 26-1].  As an alternative, Titus inspected Olum's physical inventory and software records. Titus attests that if the four cook tops had not been picked up, there would have been excess cook top inventory.  Def. Ex. B ¶ 22 [dkt. # 20-2]; see Reply Aff. ¶¶ 5-9 [dkt. # 26-1].  Neither the physical inventory nor the software records revealed "any excess cook top inventory for the 1999 and 2000 years."   Def. Ex. B ¶ 22 [dkt. # 20-2]; see Reply Aff. ¶¶ 5-9 [dkt. # 26-1].

Olum's contends that Titus reviewed "all of the relevant information provided by the consumer reporting agency and all relevant information maintained by Olum's." Def. Ex. B ¶ 23 [dkt # 20-2].  Thus, Olum's asserts that its "investigation into plaintiff's claims/dispute were reasonable and thorough."  S. of Material Facts  ¶ 24 [dkt. #16].  Huebner admits both contentions. See  Pl. Counter S. of Material Facts ¶¶ 23-24 [dkt. #25].

On May 1, 2006, after finishing the investigation, Titus completed and returned the CDV to Experian confirming that no payment had been received from Huebner for the $294.44 owed on the I-18 Contract.  Id. at ¶¶ 20, 21.   This action followed.

Huebner asserts that Olum's violated the FCRA by "willfully and/or negligently failing to:"  (a) "conduct an investigation with respect to disputed information," (b) "review all relevant information provided by the consumer reporting agency," (c) "find that the disputed information is incomplete or inaccurate," (d) "report the correct results to [the] consumer reporting agency," and (e) "modify, delete or permanently block the reporting of that incorrect item of information."  Compl. ¶ 23 (A)-(E).  Huebner asserts that Olum's violated the New York Fair Credit Reporting Act by "willfully and/or negligently failing": (a)"in the preparation for the consumer report concerning Plaintiff, to follow reasonable

procedures to assume maximum possible accuracy of the information in the report; (b) "to

disclose the nature and substance of all information in their files on the Plaintiff at the time

of the request," (c) "to delete incomplete and inaccurate information in Plaintiff's files after

conducting a reinvestigation," (d) "failing to contact the sources suggested by Plaintiff

during the reinvestigation," and (e) "to provide subsequent users of the report with the

Plaintiff's statement of dispute or a summary thereof."  Id. ¶ 24 (A)-(E).

## IV.     DISCUSSION

### a.      Fair Credit Reporting Act

Under the FCRA, furnishers of information to consumer reporting agencies must

comply with the standards contained in 15 U.S.C.A. §1681s-2.  Upon receiving notice of a

consumer dispute from a credit reporting agency, such furnishers of information must:

> (1) In general. After receiving notice pursuant to §
> 1681i(a)(2) of this title of a dispute with regard to the
> completeness or accuracy of any information provided by
> a person to a consumer reporting agency, the person
> shall--
>
> > (A) conduct an investigation with respect to
> the disputed information;
>
> > (B) review all relevant information provided
> by the consumer reporting agency pursuant to§
> 1681i(a)(2) of this title;
>
> > (C) report the results of the investigation to
> the consumer reporting agency;
>
> > (D) if the investigation finds that the
> information is incomplete or inaccurate, report those
> results to all other consumer reporting agencies to which
> the person furnished the information and that compile
> and maintain files on consumers on a nationwide basis; and
>
> > (E) if an item of information disputed by a
> consumer is found to be inaccurate or incomplete or
> cannot be verified after any reinvestigation under
> paragraph (1), for purposes of reporting to a consumer

10

reporting agency only, as appropriate, based on the
results of the reinvestigation promptly–

>> (I) modify that item of information;
>> (ii) delete that item of information; or
>> (iii) permanently block the reporting
>> of that item of information.

15 U.S.C.A. §1681s-2(b)(1).  Simply stated, "[f]urnishers of information under the FCRA . . . have a duty to provide accurate information and must correct inaccuracies when notified by a consumer reporting agency." Trikas v. Universal Card Services Corp., 351 F. Supp.2d 37, 41 (E.D.N.Y. 2005)(citing 15 U.S.C. § 1681s-2)..

When information that has been furnished to a credit reporting agency is disputed, data furnishers must conduct a "reasonable investigation of their records" to verify the disputed information. Johnson v. M.B.N.A. Am. Bank NA, 357 F.3d 426, 431 (4th Cir. 2004); see Trikas, 351 F. Supp.2d at 41 ("Under [section 1681s-2(b)], furnishers of information - after receiving notice of a dispute from a consumer reporting agency - must review information provided by the consumer reporting agency, investigate, and report any inaccuracies to all consumer reporting agencies to which the furnishers provide information.").  "Whether a defendant's investigation is reasonable is a factual question normally reserved for trial; however, summary judgement is proper if the reasonableness of the defendant's procedures is beyond question."  Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005)(citing Crabill v. Trans Union, L.L.C., 259 F.3d 662, 664 (7th Cir. 2001)).

While Huebner attempts to raise an issue of fact as to whether the cook tops were ever picked up, that dispute is immaterial to the issue now before the Court.  The material

11

inquiry under the FTCA claim is whether Olum's conducted a reasonable investigation of its records to verify the information disputed by Plaintiff.

Huebner has submitted insufficient evidence calling into question Olum's conclusion that Huebner failed to pay for the four cook tops covered under the I-18 Contract as contended on the CDV. Further, despite the fact that the merchandise pick up logs were destroyed, Huebner points to insufficient evidence challenging Olum's conclusion that the physical inventory and software records would have shown excess inventory if the four cook tops had not been picked up and, therefore, these were reasonable investigative alternatives to the merchandise pick up logs. Still further, Huebner points to insufficient evidence calling into question the accuracy of Olum's physical inventory and software records.

Assuming, *arguendo*, that the 4 cook tops were not picked up, Huebner fails to dispute Olum's contention that it conducted a reasonable and thorough investigation into his claim based upon the records that existed when the claim was submitted. Indeed, Huebner has affirmatively admitted in his responsive Local Rule 7.1 Statement of Material Facts that Olum's reviewed all relevant information that it maintained to verify the information in the CDV and, in doing so, conducted a reasonable and thorough investigation into his claim. While Huebner may not agree with Olum's conclusion, he has not raised a material question of fact as to the reasonableness of Olum's actions in reaching that conclusion. No reasonable fact finder could conclude that Olum's violated its obligation under the FCRA. Thus, whether based upon a theory of negligent or willful

noncompliance,[6] Huebner's FCRA claims fail as a matter of law. Accord Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 104 (2d Cir 1997)("Because Podell has failed to demonstrate a genuine material question regarding TRW's compliance with the reinvestigation procedures of FCRA, we affirm the grant of summary judgment to TRW on Podell's claim for negligent noncompliance with FCRA. Podell's claim for willful noncompliance with FCRA fails *a fortiori*."). Olum's motion for summary judgment is **GRANTED** as to the FCRA claims.

>        **b.    New York Fair Credit Reporting Act.**

        Olum's asserts that Huebner's claims brought under the New York Fair Credit Reporting Act are preempted by Section 1681t(b)(1)(F) of the FCRA. See 15 U.S.C. § 1681t(b)(1)(F).[7] Courts within this Circuit have held that § 1681t(b)(1)(F) preempts similar state law claims "to the extent plaintiff alleges state law claims based on defendant's failure to act once notified of [credit inaccuracies]." Prakash v. Homecomings Fin., 2006 WL 2570900, at * 6 (E.D.N.Y. Sept. 5, 2006)(discussing FCRA preemption); see Kane v. Guar. Residential Lending, Inc., 2005 WL 1153623, at *8 (E.D.N.Y. May 16, 2005) ("[A]ny state law claim predicated on a furnisher providing inaccurate information after receiving notice of the dispute is completely preempted by § 1681t(b)(1)(F).")(interior quotation marks and citation omitted); see also Gross v. Washington Mutual, 2007 WL 1404435, at

---

        [6] To support a claim for willful noncompliance under the FCRA, a plaintiff must establish a course of conduct that shows "conscious disregard" for the plaintiff, or "deliberate and purposeful" actions. Casella v. Equifax Credit Information Services, 56 F.3d 469, 476 (2d Cir. 1995).

        [7]In pertinent part, §1681t(b)(1)(F) provides that "no requirement may be imposed under the laws of any state with respect to any subject matter regulated under . . . § 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies. . . ."

*4 (S.D.N.Y. May 10, 2007)(finding claim brought under the New York Fair Credit Reporting Act preempted by the FCRA).  Inasmuch as Huebner's state law claims are based upon post-notification conduct, the claims are preempted by the FCRA and must, therefore, be dismissed.

Further, courts interpret the FCRA and the New York Fair Credit Reporting Act similarly.  Trikas, 351 F. Supp.2d at 46 (citing Ali v. Vikar Mgmt. Ltd., 994 F. Supp. 492, 498 (S.D.N.Y. 1998)).  Thus, to extent the state law claims are not preempted, "the points already discussed also warrant granting [Olum's] s summary judgment motion as to Plaintiff's state FCRA claims." Id.  Accordingly, Olum's motion for summary judgment is **GRANTED** as to Huebner's New York Fair Credit Reporting Act claims.

### c.    Olum's Counterclaim.

Although Huebner has not cross-moved for summary judgment on Olum's counterclaim, the Court will *sua sponte* address the counterclaim as it is the only remaining claim in this action.

Olum's argues that Huebner should be required to pay Olum's attorney fees and costs pursuant to 15 U.S.C. § 1681n(c),[8] claiming that Plaintiff's action was filed in bad faith or for the purposes of harassment.  Olum's characterizes Huebner's claim as an "an

---

[8] Section 1681n(c) provides:

c) Attorney's fees

Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

15 U.S.C. § 1681n(c).

14

attempt to 'extort' Olum's cooperation in removing the derogatory credit entry."  Mem. of Law in Supp. 10 [dkt. # 16-16].  Olum's predicates this claim, in large part, on the fact that Plaintiff's complaint was filed "nearly seven years after plaintiff refused to pay $294.00 due and owing to Olum's, outside the statute of limitations for a contract claim." Id. at 9.

"Fees [under § 1681n(c)] are not awarded simply because a party prevails in litigation. Instead, it must be shown that the party who did not prevail commenced and continued the litigation in bad faith or for purposes of harassment." Edge v. Professional Claims Bureau, Inc., 64 F. Supp.2d 115, 119 (E.D.N.Y. 1999).  "It is not enough to show that the pleading, motion, or other paper in question later turned out to be baseless." Rogers v. Johnson-Norman, 514 F. Supp.2d 50, 52 (D.D.C. 2007)(interior quotation marks and citations omitted).  Rather, attorney's fees will be awarded only in such egregious circumstances such as where it is demonstrated that the plaintiff "knew of the falsity and baselessness of allegations in the complaint when it was filed," Lewis v. Trans Union LLC, 2006 WL 2861059, at *4 (N.D. Ill. Sept. 29, 2006), or where plaintiff and her attorneys had documentation prior to the filing of the action showing that the FCRA action was frivolous. Mayle v. Equifax Info. Servs., Inc., 2006 WL 398076, at *2 (N.D. Ill. Feb.14, 2006).

The Court finds no such egregious circumstances here.  While the claim was filed more than seven years after the initial event, Huebner had contested the debt amount immediately after he was billed for it (more than 22 months after the initial transaction). Olum's filed the challenged credit information with Experian in August or September of 2005, more than six years after it decided to charge off the debt.  Huebner attempted to have the information removed from his credit report when he became aware of it.  Olum's

fails to present any other evidence indicative of Huebner's bad faith or motive for harassment in commencing or continuing this action. Accordingly, the Court finds no basis to award attorneys's fees under § 1681n(c). Olum's counterclaim for attorney's fees is **DISMISSED**.[9]

## V.      CONCLUSION

For the reasons set forth above, Olum's motion for summary judgment is **GRANTED** and Plaintiff's Complaint is **DISMISSED** in its entirety. Further, the Court finds no basis for an award of attorney's fees to Olum's. Therefore, Olum's Counterclaim is **DISMISSED.** The Clerk of the Court is directed to enter judgment consistent with this Decision and Order and close the file in this matter.

**IT IS SO ORDERED**

DATED: February 28, 2008

Thomas J. McAvoy
Senior, U.S. District Judge

---

[9]The Court offers no opinion as to whether Olum's may apply for costs pursuant to FED. R. CIV. P. 54(d) and Local Rule 54.1(a).

16